**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**


**UNITED STATES OF AMERICA**

       **Plaintiff,**

**v.**                                **Case No.  8:04-cr-325-T-17TBM**

**GILBERT SUTTON,**

       **Defendant.**
_____/


**AMENDED REPORT AND RECOMMENDATION**

      THIS MATTER is before the court on referral by the Honorable Elizabeth A.

Kovachevich for a Report and Recommendation on Defendant Gilbert Sutton's **Motion to**

**Suppress** (Doc. 36) and the Government's response in opposition (Doc. 39).  An evidentiary

hearing was conducted on June 14, 2006.  The court took testimony from Tampa Police

Officers Neal Williams and Dusty Rhodes, as well as clinical psychologist Debra Goldsmith.[1]

For reasons set forth herein, I recommend that the court grant in part and deny in part the

motion.

---

      [1]In response to my first Report and Recommendation (Doc. 71), Defendant filed a
Motion for Reconsideration of Report and Recommendation (Doc. 72).  That motion was
opposed by the Government (Doc. 75).  On July 14, 2006, I granted the motion to reconsider
so that I could address the issue concerning the <u>Miranda</u> waiver and withdrew the original
Report and Recommendation.  <u>See</u> (Doc. 74).

I.

Officer Williams is a member of the Tampa Police Department Q.U.A.D. squad,[2] which is a special unit responsible for investigating street-level narcotics activity in the city. On April 27, 2004, he was contacted by Officer Rhodes regarding an individual (hereinafter "confidential informant" or "CI") who indicated he could make drug purchases at the Robles Park public housing complex. Neither officer had had prior contact with the CI. Rhodes and Williams met with the CI, who indicated that he used crack cocaine and that he had purchased crack cocaine from a residence in Robles Park in the recent past. While he described the residence, he was unable to give the particular address for the apartment.

Uniformed officers took the CI to the area, and according to Williams, the CI identified the apartment at 416 Stratford as the location where he had purchased crack cocaine. Thereafter, the officers, with the assistance of the CI, made a controlled purchase from an individual they later identified as the Defendant. By Williams's description, the CI was searched, provided with purchase money, transported to the scene, constantly surveilled, and was ultimately observed by two uniformed officers approaching the residence at 416 Stratford, where it appeared he made a purchase of crack cocaine outside the apartment. A field test on the substance was positive for cocaine.

Williams and Rhodes then drafted an affidavit in support of the search warrant that was issued later that day by a state judge. Before obtaining the warrant, Williams investigated the police records related to 416 Stratford and developed the name of Gilbert Sutton as an individual associated with this address in the past. A criminal history check for Mr. Sutton

---

[2]Q.U.A.D. is an acronym for the Quick Uniform Attack on Drugs Unit.

also indicated his use of this address.  They obtained a photo of Mr. Sutton and showed to the two uniform officers who assisted with surveillance during the controlled buy.  The uniformed officers believed the person making the sale was the Defendant.  After completing the warrant application, Williams and Rhodes presented it to an assistant state attorney for review and then taken to a state court judge, who issued the search warrant.  See Gov't Exh. 1.

They executed the warrant later that evening at approximately 11:35 p.m.  Defendant was present in the residence, along with a female and some minor children.  After securing the residence, Rhodes read the warrant and then the Miranda warnings to all of the occupants. Williams and Rhodes took Defendant to the kitchen area and interviewed him.  Williams verified that Defendant had been advised of his Miranda rights.  Initially, Defendant said that he had not sold crack cocaine for two years, and he denied selling any that day.  He later said that the crack cocaine found in the residence belonged to Glenda Mitchell, a co-occupant in the apartment, she buys hundred packs of crack, and he helps her sell the crack.[3]  According to Williams, the interview took fifteen to twenty-five minutes, and the Defendant did not appear to have difficulty understanding them, comprehending what was occurring, or giving his statement to the officers.

On cross-examination, Williams indicated that his first contact with the CI was on April 27, 2004, the same day as the search.  The witness was unaware when the CI may have made any purchases from this location.  The CI was not able to identify the individual from whom he had previously purchased crack at this location.  The CI's motive for helping the

---

[3]In addition to finding crack cocaine, officers also found marijuana, a firearm and ammunition, and scales during the search.

officers was to work off charges.  Regarding the controlled buy, this witness was unable to observe the exchange, and he could not state whether the crack cocaine was on the person of the seller or had been retrieved by the seller from inside the house before delivery to the CI. There was no audio or video recording of the transaction.  The reference in the application/affidavit for the warrant indicating that the controlled buy had occurred between April 20th and April 27th, 2004, was to protect against the disclosure of the CI and all the activity in this case occurred on April 27, 2004.[4]  Counsel for the Defendant introduced a copy of the search warrant obtained from the public records of Hillsborough County.  See Def. Exh. 1.  Interestingly, this copy did not contain initials in the lower right corner of each page as did the copy introduced to the court.  The officer was unable to explain why this was so.

Rhodes testified that at the time of these events, he was a community police officer working in the area of Tampa Heights (which includes Robles Park Village).  On April 27, 2004, he contacted Williams regarding information from a CI who had purchased crack cocaine at Robles Park Village.  Rhodes indicated he had arrested the CI previously and that the CI was looking to help himself on his charges.  The officer had no recollection of using the CI before this date.  By the officer's recollection (which was relatively poor), the CI indicated he had purchased crack cocaine at a location in Robles Park several times in the past.  The officer assumed this meant the drug activity was ongoing.

---

[4]On cross-examination, the officer also acknowledged that although the search warrant authorized a nighttime search and seizure, this was not requested in the application.  However, this appears of no consequence.  Under Florida law, which differs from federal law, a search such as this may occur in the nighttime without the requirement of a special showing.  See Fla. Stat. § 933.10; State v. Nelson, 347 So. 2d 749 (Fla. Dist. Ct. App. 1977).

Rhodes was on the entry team for the search.  Upon his entry, he confronted Glenda Mitchell walking down the stairs, and the Defendant was behind her on the second floor.  The witness immediately secured and cuffed him and then sat both down in the living room so that he could read them the search warrant.  After reading the search warrant, he read both the <u>Miranda</u> warnings from a card issued by the State Attorney's office.  <u>See</u> Gov't Exh. 2.  After reading the warnings, Rhodes asked whether the Defendant understood his rights.  The Defendant indicated, "yes," and he agreed to speak with Rhodes.  In the officer's opinion, the Defendant understood his rights.  Rhodes took Defendant to the kitchen and interviewed him there for ten to fifteen minutes.  The officer recalled that Defendant was responsive and did not give any indication that he did not comprehend either his rights or the circumstances of the interview.

On cross-examination, the officer indicated that he arrested the CI that same day or a day or two before, and the CI was attempting to help his situation by cooperating with the police.  This officer gave essentially the same account of the controlled buy and the efforts to secure the warrant as did Williams.  With respect to the interview of the Defendant, Rhodes indicated that he responded "yes" when asked if he understood his rights.  The officer could not recall telling him that things would go better for Glenda or himself if he cooperated.  In the officer's view, the Defendant was responsive and gave no indication of any problems understanding.  Had he been, the officer would have documented it in his report.  This officer's account of the Defendant's statement was the same as Williams's account.

Defendant called Debra Goldsmith, Ph.D., a forensic psychologist and clinical director of a substance abuse treatment program at the Zephyrhills Correctional Institution of

the Florida Department of Corrections.  Her experience includes forensic evaluations for a number of counties and public defender units, and she has been qualified numerous times to testify as an expert.

The witness saw the Defendant at the request of his attorney on November 1, 2004, and April 14, 2005.  She administered the verbal subtest of the Weschler Adult Intelligence Scale, Third Edition.  Defendant scored 69, indicating the Defendant was in the mentally retarded range.  In addition to her interview and testing, the witness examined records from the Department of Health and Rehabilitative Services, which indicated that the Defendant had been diagnosed as mentally retarded at an early age and had been receiving disability benefits for that reason.  After her second visit with the Defendant, Dr. Goldsmith concluded that Defendant was incompetent to proceed.  As a consequence, the Defendant was shipped to a federal medical facility for evaluation and treatment until he was again found competent.  Her consideration included review of two reports from the federal facility.  According to the witness, all the reports she reviewed were consistent in describing Defendant's level of intellectual functioning.

According to the witness, the functional impact of the Defendant's mental retardation is manifested by a lack of ability for abstract reasoning.  Consistent with this, her discussions with the Defendant revealed that he was aware of certain things about the legal system but appeared deficient in understanding other areas.  In this witness's opinion, the Defendant could not comprehend the Miranda warning or understand a waiver of such rights, as he lacked the capacity to understand what he was waiving and the implications of such waiver.  By her testimony, the fact that he was handcuffed and under stressful circumstances would

6

only exacerbate the problem.  She testified that State of Florida records suggest that the Defendant operated intellectually at an age level of ten.

On cross-examination, the witness acknowledged that she had tested Defendant on only one occasion and interviewed him only twice for two hours or less on each occasion. Her first interview was roughly six months after the events at issue.  She also acknowledged the mention in a report from the federal facility at Butner, N.C., that Defendant was suspected of malingering while being observed there.  By her account, the Defendant was able to converse with her but unable to answer all of her inquiries.  She acknowledged that familiarity or routine would make it easier for someone like the Defendant to deal with a given set of circumstances.  Nonetheless, she insisted that her testing and clinical interview were consistent with other reports as to the Defendant's level of intellectual functioning and Defendant's I.Q. score would reflect he was unable to understand the <u>Miranda</u> warning or a waiver of such rights.

On re-direct , the witness opined that even if the Defendant had been read <u>Miranda</u> warnings before, it would not necessarily mean that he understood what was being read to him on this occasion.  In the witness's view, Defendant was simply  not competent to waive his <u>Miranda</u> rights.


II.

A.

It is as a fundamental principle of search and seizure law that information provided in a search warrant application be timely and that probable cause be found "at the time the

7

warrant issues." United States v. Bascaro, 742 F.2d 1335, 1345 (11th Cir. 1984) (quoting

United States v. Hyde, 574 F.2d 856, 864 (5th Cir. 1978)).  An application for a search

warrant that is based on stale information of prior misconduct is insufficient "because it fails

to create probable cause that similar or other improper conduct is continuing to occur." Id.

The government must reveal facts that show a likelihood that the illegal conduct or items

being sought are located on the premises to be searched when the warrant issues.  United

States v. Domme, 753 F.2d 950, 953 (11th Cir. 1985).  It is not enough for the probable cause

standard that the government can show that illegal activity "could have been" transpiring at

the specified location at "some time in the past." Id.  Thus, it is manifest that the proof of the

facts must be "so closely related to the time of the issue of the warrant as to justify a finding

of probable cause." Sgro v. United States, 287 U.S. 206, 210 (1932).  There is no mechanical

test that exists for determining whether information is fatally stale; instead, staleness is

determined by the facts particular to each case and the inherent nature of the crime alleged.

Bascaro, 742 F.2d at 1345.

         In making a determination of the existence of probable cause for a search warrant,

the court must judge the affidavit based on the "totality of the circumstances" and answer "the

commonplace, practical question of whether there is 'probable cause' to believe that

contraband or evidence was located in a particular place." Illinois v. Gates, 462 U.S. 213, 230

(1983).  The "totality of the circumstances" inquiry involves balancing relevant considerations

of the confidential informant's veracity, reliability, and basis of knowledge in order to assess

the credibility of her/his information.  Id.  A deficiency of one of the considerations may be

compensated by "a strong showing in the other." Id. at 233.  The Eleventh Circuit has held

that when a confidential informant witnesses first-hand the alleged wrongdoing, greater weight is given to the confidential informant's veracity and basis of knowledge, and corroboration may occur when the confidential informant is placed in "circumstances under which [she/he] is unlikely to lie." United States v. Brundidge, 170 F.3d 1350, 1353 (11th Cir. 1999) (quoting United States v. Foree, 43 F.3d 1572, 1576 (11th Cir. 1995)).

There is a presumption of validity for affidavits supporting search warrants, as a "magistrate's determination of probable cause should be paid great deference by reviewing courts." Franks v. Delaware, 438 U.S. 154, 171 (1978); Gates, 462 U.S. at 236 (quoting Spinelli v. United States, 393 U.S. 410, 419 (1969)).  Further, when law enforcement officers have reasonably relied in objective good faith on a subsequently invalidated warrant issued by a "detached and neutral" magistrate, an exception to the exclusionary rule applies.  See United States v. Leon, 468 U.S. 897, 914 (1984).  In Leon, the Court also articulated four situations where this good faith exception is inapplicable: (1)  if the magistrate or judge in issuing a warrant was misled by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard of the truth; (2) if the issuing magistrate wholly abandoned his judicial role; (3) if the search warrant was "based on an affidavit so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable"; and (4) when a warrant is "so facially deficient -- i.e., in failing to particularize the place to be searched or the things to be seized -- that the executing officers cannot presume it to be valid."  Id. at 923 (quoting Brown v. Illinois, 422 U.S. 590, 610-11 (1975)).

9

Here, Defendant argues that because the affidavit does not indicate the date on which the controlled buy occurred but only indicates a period of time from April 20, 2004, to April 27, 2004, it is impossible to determine the age of the information contained within the affidavit. By Defendant's argument, the information may well have been stale, and therefore there was no probable cause to support the warrant. Defendant also contends that there was no basis in the affidavit from which to conclude that narcotics or other illegal activity was occurring *inside* the residence at the time the warrant was issued.[5] Finally, Defendant argues that there is insufficient information or history regarding the CI to permit the court to independently evaluate her/his reliability. Instead, the affidavit summarily concludes that the CI was "reliable" and indicates only that information received from the CI resulted in the arrest of an individual in possession of crack cocaine. By Defendant's argument, the lack of the information or history about the CI supports the conclusion that she/he was not reliable or credible to the degree necessary to support a finding of probable cause for the issuance of a search warrant. Regarding the "good faith" exception under <u>Leon</u>, Defendant maintains that not only was there a lack of actual probable cause, but the affidavit was so lacking in indicia of probable cause that the officers' belief in the existence of such cause was unreasonable and all the items seized as a result of this search must be excluded.

In its response, the Government contends that because the affidavit states that between April 20, 2004, to April 27, 2004, the affiants met with a CI and conducted an

---

[5]Defendant maintains that since the evidence indicates that neither the CI nor the police had the opportunity to view the interior of the house to determine whether there were additional drugs inside of the house, there was no adequate link between the controlled buy and the residence at 416 Strafford Avenue East to warrant a search therein.

10

undercover buy, the affidavit contains sufficient temporal information that allows the court to

ascertain whether the information being supplied is stale.  On the matter of the informant's

reliability, the Government first urges that the affidavit sets forth that the CI's information

resulted in the arrest of an individual in possession of crack cocaine, which supports her/his

reliability.[6]  Next, it urges that the recitation in the affidavit concerning the CI's purchase of

crack cocaine in a controlled buy at the 416 Strafford East address and the fact that the seller

of the crack cocaine exited from the residence and returned inside after the sale, as well as the

CI's statement that additional crack cocaine could be purchased at the residence in the future,

were more than sufficient to establish the CI's reliability and to support a conclusion that

evidence of drug activity would be found on the premises.

   Upon my consideration, while the issue is quite close and the matter not without

some doubt, the search warrant was properly issued on probable cause, and even if it was not,

the evidence would still be admissible under the "good faith" exception of <u>Leon</u>.  Although

there is evidence to suggest that the affiants misled the state court judge as to the reliability of

---

[6]This contention appears wholly without merit, and I am surprised that the Government would even advance it in defense of this motion.  In pertinent part, the warrant application/affidavit states, "The confidential informant is deemed reliable in that information and effort put forth, resulted in the arrest of an individual in possession of crack cocaine."  <u>See</u> (Doc. 39-2 at 6).  The implication from this is that the CI was reliable because her/his information had been used successfully at some point in the past.  This was not borne out by the evidence at the hearing.  In fact, neither officer had used this CI, and it appears their first contact with the CI was on April 27, 2004.  Unfortunately, neither party explored the representation further at the hearing.  I am left to conclude that the representation was false and made at least recklessly by the affiants and that it must be considered in accordance with the rule in <u>Franks v. Delaware</u>.  Indeed, apart from the independent corroboration derived from the controlled buy by this CI, the affiants had no basis to assure the judge that, during April 2004, they had developed information from a "reliable" confidential informant.  Prior to April 27, 2004, neither affiant appears to have had any dealings with this person except to arrest him and thus lacked any  basis to vouch for his reliability or credibility.

this informant, I conclude that the judge could have found probable cause to support the search on the basis of the affiants' report of a controlled buy from a person the police identified as the Defendant, a person with a known criminal history involving drugs and express ties to the residence, where, on the date in question, he was seen coming out of the residence to complete the sale of crack cocaine to the CI and then immediately returning inside.  Although the affidavit indicated that the utilities at this residence were in the name of another person, it was not unreasonable for the state judge to infer that the Defendant used this location to sell drugs for some period of time and that such activity would likely continue in the future.  Given the nature of street level drug activity of this sort, the fact that the affidavit dated the controlled buy as occurring between April 20, 2004, and April 27, 2004, also did not render the information so stale as to preclude a finding of probable cause.

In this circuit, staleness is an issue that is decided on the facts particular to a given case, and the nature of the suspected criminal activity, the habits of the suspect, the character of the items sought and the function of the premises to be searched are all important considerations.  See United States v. Bervaldi, 226 F.3d 1256, 1265 (11th Cir. 2000).  "When criminal activity is protracted and continuous, it is more likely that the passage of time will not dissipate probable cause."  Id. (quoting Domme, 753 F.2d at 953).  Drug dealing is an ongoing activity, not an isolated occurrence.  See Bascaro, 742 F.2d at 1346.  Residency, too, is not transitory but generally endures for some length of time.  See Bervaldi, 226 F.3d at 1265.  Here, the state judge could reasonably conclude from the controlled buy and the attendant circumstances of the Defendant's prior criminal history and his connection to this address, as well as his presence in and out of the premises, that crack cocaine or other

12

evidence of the sale of crack cocaine was likely to be found at this residence at the time he issued the warrant.[7]  Even if my conclusion were otherwise, I would find this evidence sufficient to permit the admission of the evidence from the search under the "good faith" exception of <u>Leon</u>.

Under <u>Leon</u>, evidence obtained pursuant to a search warrant should be suppressed "only if the officers were dishonest or reckless in preparing their affidavit or could not have harbored an objectively reasonable belief in the  existence of probable cause." <u>United States v. Martin</u>, 297 F.3d 1308, 1313 (11th Cir. 2002) (quoting <u>Leon</u>, 468 U.S. at 926).  Here, I conclude that the affiants misled the state court judge by their representations concerning the reliability of this informant.  However, even setting aside the affiants' untrue statements in support of the CI's reliability, this affidavit otherwise sets forth sufficient indicia of probable cause arising from the controlled buy to justify a reasonable belief in the warrant's validity. <u>See</u> <u>United States v. Williams</u>, No. 04-14914, 2006 WL 1071232, at *6 (11th Cir. Apr. 24 2006).  While I do not condone the misrepresentation by the affiants, the facts concerning the controlled buy were not controverted in any other way.  Those facts, coupled with the information about the Defendant, justified the officers' good faith belief that there was

---

[7]The Defendant cites <u>United States v. Huggins</u>, 733 F. Supp. 445 (D.D.C. 1990), in which the court held that there was no probable cause for a warrant or a good faith exception where the affidavit in support of the warrant contained no time frame for the controlled buy and such could not otherwise be inferred.  Additionally, the Defendant cites <u>United States v. Turner</u>, 713 F. Supp. 714 (D. Vt. 1989), where the court again found no probable cause and no good faith exception where the affidavit upon which the warrant was based did not contain a time frame for the informant's observations of an illegal gambling operation.  Both cases are factually distinguishable from the instant matter given that the affidavit here states the dates during which the controlled buy occurred, thus permitting the court a temporal reference by which to assess the facts for probable cause.

probable cause to support the warrant and thus the search.  Even in the absence of actual

probable cause, I would deny this aspect of the motion to suppress.

B.

Regarding the Defendant's statements, he contends that he suffers from low

intellectual functioning and unclear, confused, and delusional thinking, and, as such, he was

psychologically coerced into speaking with the officers by promises of leniency in his own

case if he cooperated with them and by threats of harm to his girlfriend if he failed to

cooperate.  At the hearing, the defense expert maintained that because of Defendant's well-

documented mental retardation, he was not capable of understanding the <u>Miranda</u> warnings or

making an informed, intelligent waiver of such rights.  There appears no dispute that

Defendant was read his <u>Miranda</u> rights shortly after he was seized and cuffed by Rhodes.

Thus, the only real issue concerns his ability to understand those rights and freely, voluntarily,

and intelligently waive them.

In response, the Government argues that the Defendant's claim that he suffers from

"unclear, confused, and delusional thinking" is unfounded and without factual basis.  Further,

the Government argues that the Defendant's claims regarding his intellectual functioning are

based on a psychological evaluation made in 1979 when he was sixteen and are therefore

outdated and inaccurate.  In general, it assures the court that the Defendant was fully aware

and completely understood what he was doing when making statements to the police, and

thus, he voluntarily, knowingly, and intelligently waived his <u>Miranda</u> rights.  The Government

denies that there was any coercive activity on the part of law enforcement officials, and while

the Defendant may have a low intelligence level, it does not mean that he is unable to

14

comprehend the reading of his <u>Miranda</u> rights, especially in light of his eleven previous felony convictions.

A defendant "may waive effectuation" of the constitutional rights conveyed in <u>Miranda</u> warnings "provided the waiver is made voluntarily, knowingly, and intelligently." <u>Miranda v. Arizona</u>, 384 U.S. 436, 444 (1966). The Government bears the burden of establishing a voluntary, knowing, and intelligent waiver by a preponderance of the evidence. <u>United States v. Farris</u>, 77 F.3d 391, 396 (11th Cir. 1996). The Supreme Court has articulated a two-part inquiry in determining whether a defendant's waiver was made voluntarily, knowingly, and intelligently. In <u>Moran v. Burbine</u>, 475 U.S. 412 (1986), the Court stated,

> First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception. Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it. Only if the "totality of the circumstances surrounding the interrogation" reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the *Miranda* rights have been waived.

<u>Id.</u> at 421. Regarding the first prong, it is not enough to render a waiver involuntary that a defendant suffers a mental disability. Additionally, there must be coercion by an official actor for the waiver to be involuntary. <u>See</u> <u>United States v. Barbour</u>, 70 F. 3d 580, 585 (11th Cir. 1995) (citing <u>Colorado v. Connelly</u>, 479 U.S. 157, 169-70 (1986)). In the context of this case, the Defendant must show that the officers took advantage of his mental impairment in order to satisfy the first prong. <u>Id.</u>

At the outset, I find the evidence clearly establishes that the Defendant is of low intellectual ability and possessed of limited ability for abstract reasoning and dealing with

15

complex circumstances.  However, under the applicable standard, it is not enough to establish involuntariness that the Defendant establish his mental disability.  On the matter of the voluntariness of his statement, he must first establish government overreaching.  Here, the Defendant is unable to do so.

Contrary to the Defendant's assertions, a careful review of the record reveals nothing extraordinary about the officers' conduct in interviewing him.  Defendant makes no adequate showing that either officer promised him or his girlfriend leniency or utilized a threat of harm to his girlfriend to improperly induce him to speak with them.  On the record before the court, the best the Defendant can establish is that Rhodes could not recall employing such promises or threats to induce the Defendant to talk with them.  Although the officer acknowledged, in general, that they might tell a person that things might go better if the person cooperated, he did not recollect making such a statement here.  This testimony has not been refuted by the Defendant in any way.  There is also no demonstration that the officers employed deception in any way or that the circumstances of the seizure and interview were so physically or mentally intimidating that the Defendant acted involuntarily in this instance.  Indeed, there is nothing in the record indicating that these officers had knowledge of the Defendant's mental impairment, let alone took advantage of it.  While there is no doubt that the Defendant suffered from a diminished intellect at the time, absent proof of overreaching at the hands of these officers, he cannot prevail on his claim that his waiver or his statement were involuntary.[8]

---

[8]The circumstances in this case are not unlike those in <u>Connelly</u>, where the defendant was found to be suffering from a mental illness that caused him to hear voices, and which according to expert testimony, interfered with his volitional abilities.  There, despite these circumstances, the Court concluded the <u>Miranda</u> waiver was not ineffectual because it was not a product of police coercion.  <u>Connelly</u>, 479 U.S. at 169.  Similarly, the Defendant's low level

As for the second prong, whether the Defendant had "a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it," the matter is more problematic.  While due process requires only that a statement be uncoerced, the Miranda rule "conditions the admissibility of an uncounselled statement . . . on the state's demonstrating 'that the defendant knowingly and intelligently waived his privilege against self-incrimination and his right to retained or appointed counsel.'"  Miller v. Dugger, 838 F.2d 1530, 1537 (11th Cir. 1988) (quoting Miranda, 384 U.S. at 475).  Whether there has been an intelligent waiver will depend on the particular facts and circumstances in the given case, including the background, experience, and conduct of the accused.  See Edwards v. Arizona, 451 U.S. 477, 482 (1981) (quoting from Johnson v. Zerbst, 304 U.S. 458 (1938)).  Mental retardation is a factor to be considered in deciding the validity of a waiver and may render a defendant incapable of intelligently waiving his *Miranda* rights.  See Miller, 838 F.2d at 1539; Cooper v. Griffin, 455 F.2d 1142 (5th Cir. 1972).

As noted above, the burden of persuasion is on the government on this issue.  Here, the Government relies on the testimony of the officers and inferences it believes follow from the circumstances in this case and the Defendant's criminal history.  Apart from referencing the mention of "malingering" in a report from the examiners at the federal facility at Butner, N.C., the Government has offered no contrary psychological evidence reflecting on the import of the Defendant's low intellect.[9]  Instead, it urges that the Defendant's numerous felony

---

of intelligence, though inhibiting his ability to comprehend abstract ideas, does not render his waiver ineffectual absent a showing of coercion, deception, or intimidation by the police.

[9]For whatever reason, the government has failed to introduce any evidence from the examiners or records at either of the federal medical facilities at which Defendant was

convictions evidenced a familiarity with the criminal process that makes it likely he understood the rights and the import of talking with the police.  Citing Defendant's ability to answer the officers' questions coherently and without evidence of confusion or misunderstanding, it extrapolates that he understood the import of the warnings and the waiver.  The Government also suggests that the psychologist's limited and belated contact with the Defendant undermines any firm conclusions regarding his ability to understand the <u>Miranda</u> warnings many months previous.

In rebuttal, the Defendant cites the testimony from an examining psychologist regarding the import of the Defendant's very low intellect.[10]  While the officers described the Defendant as fully coherent and appropriately responsive, Dr. Goldsmith discounted the significance of these observations and testified, in essence, that Defendant's intellect was such that even if he was coherent and responsive, he lacked the ability to understand the <u>Miranda</u> rights and the implications of a waiver of such rights.  Her conclusions in this regard appear to be the product of psychological testing, the results of which were said to be consistent with past and current psychological testing by others; the witness's general impressions of the Defendant from speaking with him; and the generally accepted view that mentally retarded

hospitalized during the period of his incompetence in these proceedings.

[10]By his motion, Defendant also maintains that he suffered from unclear, confused, or delusional thinking.  There is no evidence at all that he was delusional.  As for whether or not he was confused or unclear, the only evidence that might support this contention is that the officers claimed to have interviewed him for fifteen to twenty minutes, and one must wonder what took so long given the relatively short statement attributable to the Defendant.  In any event, these allegations are not the reason I find it appropriate to grant this aspect of the motion.

persons have limited functional ability for abstract reasoning and dealing with complex situations.

The issue is a close one, and had the Government done a better job of addressing the significance of Defendant's mental retardation or its suggestion of his "malingering," perhaps a different result would be indicated.  However, because I cannot conclude by a preponderance of the evidence introduced at the hearing that the Defendant had a "full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it," I must conclude that Government has failed to establish a knowing and intelligent waiver in this instance.  According to the unrebutted testimony of Dr. Goldsmith, the Defendant was incapable of such, and the fact that the Defendant was responsive to the police is no indication that he understood, in the first instance, his Miranda rights or the import of a waiver of those rights.  While Defendant's prior criminal convictions may have given him a familiarity with the criminal process, without more, I cannot infer a knowing and intelligent waiver from that circumstance either.  Here, on the basis of the evidence presented, the Defendant gets the benefit of my doubts.  In accordance with Miranda, because the Government has failed to prove a knowing and intelligent waiver, the Defendant's statement should be suppressed.

19

III.

For the foregoing reasons, I recommend that the court GRANT in part and DENY in part Mr. Sutton's Motion to Suppress (Doc. 36).

Respectfully submitted on this
1st day of August 2006.

THOMAS B. McCOUN III
UNITED STATES MAGISTRATE JUDGE

## **NOTICE TO PARTIES**

Failure to file written objections to the proposed findings and recommendations contained in this report within ten (10) days from the date of its service may constitute a waiver of the issues raised herein and shall bar an aggrieved party from attacking the factual findings on appeal and a *de novo* determination by a district judge.  28 U.S.C. § 636(b)(1); M.D. Fla. R. 6.02.

Copies furnished to:
The Honorable Elizabeth A. Kovachevich, United States District Judge
Counsel of Record